Dissenting opinion filed by Circuit Judge Rogers.
SILBERMAN, Senior Circuit Judge:
When new sources of power generation connect to the existing transmission grid, the grid often requires new construction beyond the point of interconnection in order to accommodate the increased flows of electricity. FERC issued a series of orders empowering incoming generators within the Midcontinent Independent System Operator (MISO) region[1] to elect to self-fund this new construction, or to seek financing from third parties, regardless of whether the current grid owners wish to fund the construction themselves.
The Commission justified the orders on two grounds. First, it found that allowing transmission owners to choose between funding options—and thus, potentially, to impose subsequent charges to generators via transmission owner funding—could allow the transmission owners to discriminate among generators. Secondly, it held that the charges to generators would be (or could be) unjust and unreasonable under the Federal Power Act. Petitioning transmission owners challenge both grounds. We conclude that Petitioners are correct regarding the discrimination point: there is neither evidence nor economic logic supporting FERC’s discriminatory theory as applied to transmission owners without affiliated generation assets.
FERC’s second ground raises a unique and important conceptual issue. Petitioners argue that involuntary generator funding compels them to construct, own, and operate facilities without compensatory network upgrade charges—thus forcing them to accept additional risk without corresponding return as essentially non-profit managers of these upgrade facilities. We *574 do not.think that FERC adequately responded to this argument. We therefore remand the case to the Commission.
I.
We have previously explained the' series of steps FERC took to unbundle the electric power system, enabling and encouraging new independent generators to create a competitive market for power generation.[2] Transmission owners, which had previously served their own vertically integrated sources of power generation, were obliged to accept power from any sourcé on a non-discriminatory basis.
For independent generators to utilize the grid, they must first connect to it. FERC thus used its rulemaking powers to issue Order No. 2003, which standardized the procedures for generator interconnection and directed each transmission network to maintain a pro forma generator interconnection agreement.[3] Order No. 2003 also established the “at or beyond” rule, Which distinguished between two types of new construction necessary to connect new generation sources into the grid. See Nat’l Ass’n of Regulatory Util. Comm’rs v. FERC, 475 F.3d 1277, 1284-86 (D.C. Cir. 2007). The first category, called “interconnection facilities,” includes those facilities and equipment that lie between the generation source and the point of interconnection with the transmission network. Under the “at or beyond” rule, the cost of interconnection facilities are the sole5 responsibility of the incoming generator. That allocation of costs is undisputed in this, proceeding. And Petitioners do not own or manage those “interconnection facilities.” The, second category. • includes those additional facilities. and equipment that are needed beyond the “point of interconnection”—in other words, any -new construction that occurs within Petitioners’ transmission grid itself to accommodate the incoming flows of new power. This latter category of construction, called “network upgrades,” is the focus of the present dispute. - ' '
* ⅛ *
As we have also explained, FERC encouraged the creation of Regional Transmission Organizations (RTOs) to integrate the fragmented transmission grid.on a regional basis, along- with Independent System Operators (ISOs) as non-profit entities which would control access to the grid within their respective regions. Wisconsin Public Power, Inc., 493 F.3d at 247. In Order No. 2003, the' Commission set a default rule that transmission owners would bear responsibility for the network upgrades, but gave ISOs “flexibility to customize its interconnection procedures and agreements to meet regional needs.” Order No. 2003 at P 827; id. at P 676. In this case, we encounter MISO, which qualifies as both an RTO and an ISO.
Originally, MISO had allocated the costs equally between the incoming generator and the transmission owner. As such, under transmission owner funding—which it could choose—the transmission owner *575 would initially provide the capital for construction, but would recover 50 percent of that capital (a “return of’ capital), along with an appropriate return on that capital, through network upgrade charges. It would fund the other 50 percent of the costs by passing them on to all- of its customers through its rates—again, including an appropriate rate of return. Under generator funding, the generator would initially provide the capital for construction, and would receive 50 percent of that capital from the transmission owner through credits for transmission service. E.ON at P 3.
But a problem arose: this 50/50 arrangement placed most of the cost burden on the pricing zone where interconnection occurred, but the power from the new generation sources often exceeded the load within those local zones in which they connected. Midwest Independent Transmission System Operator, Inc., 129 FERC ¶ 61,060, at P 7 (2009) (“MISO Tariff Amendment”). As a result, the local customers of the transmission owner bore a disproportionate share of the cost burden of upgrades that supported power that would ultimately benefit more remote customers throughout the MISO region. Id. at P 11. Rather than forcing their local customers to shoulder this regional burden, several local transmission owners threatened to withdraw from MISO if the cost allocation remained unchanged. Id. at P10.
To remedy this problem, MISO proposed (and FERC approved) a new allocation of capital costs: for network upgrades rated at 345 kilovolts or above, the interconnecting generator bears 90 percent of those costs, and transmission owners (and their local customers) bear 10 percent. -In' other , words, the 10 percent would be included in ■ the transmission owner’s rate base. For projects rated below 345 kilo-volts, the interconnecting generator bears 100 percent of the costs. This reallocation was intended to comport with FERC’s “principle that network upgrades should be paid for by the parties that cause and benefit from such .upgrades.” MISO Tariff Amendment at P 3.
The manner in which the incoming generator and transmission owner .actually pay these capital costs depends upon the way the network upgrades are funded. Originally, the MISO tariff contained three options for providing the capital required to construct the network upgrades. We need not discuss the first because it was removed by the Commission in its E.ON decision.[4]

Under the second alternative, Option 2 or “generator funding,” the interconnecting generator would’ provide the funding for the network upgrades prior to construction. The transmission owner would not refund this capital to the interconnecting generator, and would neither include the capital in its rate base nor charge the interconnecting generator a return on that capital.[5] In short, generator funding means the owner of the transmission grid neither pays for, nor earns a return upon, the new construction that takes place within its network.

*576 Under the third alternative, “transmission owner funding,” the transmission owner pays for the construction of the 'upgrades to its network and then recovers the incoming generator’s portion of the cost burden over time through periodic network upgrade charges that include a return on the capital investment. These network upgrade charges are paid from the incoming generator to the transmission owner over the duration of the agreement. Importantly, they include both a return of capital, which is the 90 percent cost reimbursement paid over time as the network upgrades depreciate, and a return on capital. They are thus economically equivalent to inclusion in the rate base, with the exception that they are charged specifically to the incoming generator rather than to all of the transmission owner’s customers. Any portion of the upgrade costs that remains to be borne by the transmission owner is then passed on to all of its customers through its rates.
Following the Commission’s E.ON decision, then, it was clear that the transmission owner could choose between two options—generator funding or transmission owner funding—to finance construction of network upgrades when an incoming generator, sought to directly interconnect with its network.
To further complicate the matter, however, the addition of new generation sources can cause second-order effects across the grid. Sometimes, in order to support flows of power from a new source, network upgrades must be made by transmission owners that do not connect directly to the incoming generator. And in other instances, the coincidence of multiple interconnection requests can create a need for a set of common network upgrades, which enable the grid to support the several incoming generators. In these two situations, MISO’s tariff did not initially permit transmission owners to choose between funding options.
It was that disparity between the treatment of direct and indirect network upgrades which gave rise to this case. In 2014, when faced with the prospect of building network upgrades to support an indirectly connected incoming generator, a transmission owner named Otter Tail requested that MISO offer it the same choice (between generator funding and transmission owner funding) enjoyed by directly connected transmission owners. MISO consented, and submitted an agreement to FERC that would allow Otter Tail to elect transmission owner funding.[6] The incoming generator objected to this request, preferring instead to utilize generator funding for the network upgrades that would be needed to support its power.
Otter Tail also filed a complaint under Sections 206 and 306 of the Federal Power Act. It contended that the disparity between directly connected transmission owners (who could choose to fund the upgrades to their networks) and indirectly connected transmission owners (who could not choose transmission owner funding) rendered MISO’s tariff unjust and unreasonable. Otter Tail requested that FERC order MISO to bring all transmission owners into alignment by modifying its tariff to allow the choice of transmission owner funding for indirect interconnections.
The Commission agreed with Otter Tail that this disparity was unsupportable. In its June 2015 Order,[7] the first of the or *577 ders under review in this case, it found that because “the funding and construction obligations are equal whether the connection of a new generator is direct or indirect ... the same funding options should be available to all interconnection customers in MISO.” June 2015 Order at P 47. Ironically, it cured the disparity not by providing the choice of transmission owner funding to indirectly connected owners—but instead by removing that choice from those with direct connections. Otter Tail was hoist on its own petard.
The Commission determined that providing directly connected transmission owners with the ability to select transmission owner funding “may be unjust, unreasonable, unduly discriminatory or preferential because it ... may result in discriminatory treatment by the transmission owner of different interconnection customers.”[8] June 2015 Order at P 48 (emphasis added). This discriminatory treatment, according to FERC, stemmed from the difference in costs borne by the generator under the two types of funding.
* * *
Those cost differences, according to the Commission, had two main causes. FERC thought that generators missed the opportunity to seek favorable construction funding in competitive capital markets; in other words, the use of transmission owner funding could prevent the generator from finding a better deal from a third party. June 2015 Order at P 48. Second, FERC contended that transmission owner funding imposed a more onerous “security” requirement on generators. June 2015 Order at P 49 & n.110. Transmission owners required generators to provide some form of financial assurance—such as a guarantee, surety bond, or letter of credit—that was sufficient to cover the cost commitments undertaken by the transmission owner in constructing the network upgrades. Under generator funding, this requirement lasted only for the duration of construction. But under transmission owner funding, security was required for the duration of the funding agreement. As an example, one proposed transmission owner funding agreement specified tfyat an incoming generator would maintain a letter of credit over a term of 20 years. December 2015 Order at P 38 & n.60.
Given these tentative findings, FERC instituted a formal adjudicatory proceeding under Section 206 of the Federal Power Act, requiring MISO to either modify its tariff to require generator consent for transmission owner funding, or to explain why the Commission’s views were not correct. This proceeding attracted a large cohort of intervenors; various transmission owners (including Petitioners), independent generators, and associations that represent those groups each contributed comments before the Commission. In the second of the orders under review in this case (“December 2015 Order”), FERC affirmed its earlier finding that “it is potentially unjust, unreasonable and unduly discriminatory to deprive the interconnection customer of the ability to provide its own *578 capital funding.” This petition for review followed.[9]

II.
The Commission’s position before us largely tracks its final decision below. It relied, as we noted, on two grounds to determine that transmission owners may not insist on transmission owner funding, but that generators must'instead have the option to self-fund. The first is that giving transmission -owners the option to fund the upgrades provides them with the power to discriminate amongst generators who wish to connect to the grid. (Discrimination is, of course, prohibited by the Federal Power Act. See 16 U.S.C. §§ 824d(b); 824e(a).) Petitioners argue vigorously, however, that there is neither evidence of discrimination[10] nor any economic incentive on the part of transmission owners to discriminate. To be sure, if the transmission owners still owned integrated generar tion facilities, that would present a competitive motive. But in emphasizing Order No.. 888 and the Supreme Court’s decision in New York v. FERC, 535 U.S. 1, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002), the dissent harks back to a time we once .described as “the bad old days,” when transmission companies also owned generation facilities and operated as vertically integrated monopolies. Midwest ISO Transmission Owners v. FERC, 373 F.3d 1361, 1363 (2004); cf. Dissent at 590-91. This is fighting a battle that has already been won. Here, only one , of the petitioning transmission owners—in Missouri—still owns a generator; none of the rest do. And FERC did not pay any attention to that small exception among Petitioners; it did not limit its order to that generator. Moreover, as we know 'from our other cases, the broader trend following Orders No. 888 and 2000 has been toward divestiture by transmission owners of generation assets.[11] Granted, FERC is not obliged to show actual evidence to support a determination of potential discrimination, but in the absence of evidence, the Commission must at least rest on economic theory and logic. We agree with Petitioners; that is lacking here.
■ Our dissenting colleague suggests that we actually lack jurisdiction to consider Petitioners’ : anti-discrimination argument—at least insofar as Petitioners point out that only a transmission owner which also owns a generator would have an incentive to discriminate—because Petitioners did not explicitly make that specific point to the Commission. But when Petitioners vigorously contended there was no evidence to support a finding of discrimination and no reason to “predict[J” it would occur as “a foregone conclusion,” Request for Rehearing of the Indicated *579 Transmission Owners, Docket Nos. EL15-68, EL15-36 (FERC January 28, 2016) at 23 n.59, it can hardly be thought a new ■argument to suggest what might constitute evidence of potential discrimination, if it were to exist.
The second theory upon which FERC based its orders was that allowing transmission owners to insist on transmission owner funding would be “unjust and unreasonable” under the Federal Power Act because it imposed increased costs without any corresponding increase in service. We should note at the outset that the Commission does not assert that transmission owner funding is inherently unjust and unreasonable; it is only if the transmission owner chooses that method of funding that FERC believes it crosses the unjust and unreasonable line. (That suggests that FERC is really seeking to enhance the generator’s bargaining position vis-a-vis the transmission owners—which, of course, is why generators have intervened in support of the Commission.) As we explained, FERC wants generators to have the .option to seek the funding for .the new construction from parties other than the transmission owners because it asserts that cheaper funding may be available elsewhere. FERC observes that the transmission owners have an incentive to increase costs because such costs will either be included in the rate base—upon which revenue can be predicated—or in charges back to the generator owner, which also include a measure of profit. FERC also states that the transmission owners have no right to the generator’s financing business.
. The Commission . contends moreover that generator funding avoids the larger security costs under transmission owner funding. We are puzzled by FERC’s reasoning on this point, because if the generator had found another source of capital to c.over. the costs of the upgrade, we can’t imagine that the generator wouldn’t have to provide the same kind of security to that third party—covering the risk of default—that it does for transmission owners.[12] Still, it is certainly possible, if not probable, that a generator could find an alternative source of capital (including any necessary security) that would be cheaper than that provided by the transmission owner. Indeed, as the dissent notes, the Commission states a simple economic truth in recognizing that the generators “have an incentive to find lowest cost funding solutions, while transmission owners do not.” Dissent at 588.
But this proposition applies equally to all cost components of Network Upgrade construction, which Petitioners perform on the generators’ behalf—not' merely its funding. By the same logic, since they bear a greater share of cost responsibility, the generators also have a sharper incentive than Petitioners to reduce the costs of raw materials," or construction labor/ or design fees. This is why the generators can challenge inclusion of any such costs that deviate unreasonably from a fair market price before the Commission. "
In any event, it does not necessarily follow from any incentive differences that FERC may compel transmission owners to operate the upgrades without an opportunity to earn a return. Such a determination would require reasoned justification by the *580 Commission, and consideration of any appropriately raised concerns by the parties. And Petitioners do in fact raise two rather powerful arguments against FERC’s “unjust and unreasonable” theory.
First, they claim that under compelled generator funding, transmission owners will be forced to assume certain costs that are never compensated. Keeping in mind that the transmission owners will own and operate the grid, including the upgrades, they will bear liability for insurance deductibles and all sorts of litigation, including environmental and reliability claims (such as blackout risks). The Commission’s response dismisses these risks; it asserts ■that upgrades might actually reduce congestion risks, see August 2016 Order Denying Rehearing at P 17, but it makes no real attempt to holistically assess all of the various risks and benefits to the transmission owner caused by the addition of the upgrade facilities.
Instead, FERC asserts that because “this case concerns only the capital costs of facility construction,” Resp.Br. 35, and since “[tjransmission owners will recover their cost of service (beyond capital costs) through their, transmission rates,” id. (quoting December 2015 Rehearing Order P 57), the petitioning transmission owners have no justifiable complaint.[13] But in this adjudication, FERC never acknowledged that these separate risks and consequent expenses even'exist—they are thought to be somehow “baked in” to the existing compensation structure. See August 2016 Order Denying Rehearing at P 13. If Petitioners are correct that they face increased risk without compensation, that would be relevant and could certainly undermine FERC’s conclusion.
Contrary to the dissent’s characterization, FERC’s musing that network upgrades might actually reduce reliability risk is hardly a “finding” of fact to which we are obliged to defer. It is, at most, a possibility to be explored—and one that sounds a bit far fetched to us. In any event, FERC makes no assertion that any such reduction of reliability risk’would be of sufficient magnitude that the added facilities would actually reduce the net overall risk borne by the owner-operator. Further, the dissent’s suggestion that the environmental risks are identical regardless of who provides capital for the upgrades is something of a diversion. Of course that is true. The problem is that the risk is always borne by the transmission owner, and under Option 2, Petitioners contend they are not compensated for bearing it. And whether the transmission owner chooses, at its own expense, to insure that risk is obviously irrelevant. Cf. Dissent at 592.
We therefore think that FERC inadequately considered Petitioners’ argument[14]
*581 that all costs, and risks, are not baked in— that, in fact, shareholders are forced to accept incremental exposure to loss with no corresponding benefit. Without analysis, the Commission casts doubt on the likelihood that these risks exist. But if Petitioners are conceptually correct that they bear these risks as owners of the transmission lines, it supports their basic contention that they are entitled to be compensated now as owners for operating the upgrades. And since this contention was raised appropriately, failure to meaningfully respond to it makes FERC’s decision arbitrary and capricious. See PSEG Energy Res. & Trade LLC v. FERC, 665 F.3d 203, 208, 209-10 (D.C. Cir. 2011).
Petitioners’ second—and more fundamental—argument is that FERC’s orders require them to act, at least in part, as a nonprofit business. Put another way, by modifying the transmission owners’ entire enterprise, FERC’s orders attack their very business model and thereby create a risk that new capital investment will be deterred. In its orders, FERC distorted and dismissed this argument, stating derisively that because generators bear responsibility for most of the capital costs under generator funding, the entire enterprise argument “implies that the affected system operator is owed the interconnection customer’s financing business.” June 2015 Order at P 50. FERC seems to believe that transmission owners are simply not entitled to participate in funding the network upgrades, and importantly to earn a return on capital.
But a careful reading of Supreme Court precedent reveals that a regulated industry is entitled to a return that is sufficient to ensure that new capital can be attracted. See Hope, 320 U.S. at 603, 64 S.Ct. 281. Therefore, as we have often said, a utility’s return must allow it to compete for funding in the financial markets. See, e.g., Maine v. FERC, 854 F.3d 9, 20 (D.C. Cir. 2017). Investors, however, invest in entire enterprises, not just portions thereof. FERC must explain how investors could be expected to underwrite the prospect of potentially large non-profit appendages with no compensatory incremental return. It is certainly true, as the transmission owners note, that the answer FERC offered—to cajole consent from the generators[15]—is a non sequitur.

Our dissenting colleague responds to Petitioners’ primary argument—that FERC’s order inquires them to operate partly as a non-profit business—by asserting that Hope does not guarantee that each portion of a regulated business will be profitable. Dissent at 592. That is, of course, true, but it seems undisputable that when portions of a business are unprofitable, it detracts from the attractiveness to investors of the business as a whole—and that is a concern that the Commission must at least address under Hope’s, capital-attraction standard.

*582 This .is to say nothing of the fact that added complexity can be expected to impose its own form of deterrence upon investors, .via information costs. Even if FERC could somehow provide protection for each of the many risks involved, potential investors would need to expend costly time and resources to examine and understand what the petitioning transmission owners would call the “non-profit” segments of their business, in order to verify that they aré, in fact, riskless. And investors’ confidence in their own assessment of such risklessness would itself carry some perceived risk. To the extent that other comparable utilities do not carry responsibility for such “non-profit” lines of business, and earn the same r.ate of return on the assets in. their rate base, they would thus become relatively more, attractive to investment professionals.
Notwithstanding these concerns, the non-profit innovation might remain bearable so long as the generator-funded upgrades growing inside the grid remain tiny relative to their host. But if more and more of a transmission owner’s business is to be owned and operated on a non-profit basis, these additions would likely deter investors and diminish the ability of the transmission grid to attract capital for future maintenance and expansion. That FERC’s orders cross a rather significant conceptual line was revealed when FERC’s counsel was asked whether, if a group of generators got together to fund a billion-dollar upgrade that totally refurbished a portion of the grid, the transmission owner would be obliged to operate and assume liability for the upgrade—with operations and maintenance costs reimbursed, but no return. The .answer, alarmingly, was yes. Oral Arg. at 39:36; see also id, at 51:39-52:15. Transmission owners’ desire to retain the' choice tp fund the upgrades is therefore much more than a, claim of entitlement to the generator’s “financing business.” It is, at root, a desire to retain, control over their own business.
In its discussion of the balance of investor and consumer interests. mandated by Hope, the Commission stresses that capital costs are ultimately borne by the generator under either option.' But this- backward-looking perspective elides Hope’s forward-looking capital attraction standard. 320 U.S. at 605, 64 S.Ct. 281. The ex ante question of cost allocation is thus analytically distinct from the ex post question of responsibility for ownership and operation that we discussed above. FERC cannot sufficiently respond to the transmission owners’ clearly stated concerns about the latter question by merely pointing to the outcome of the former.
In sum, petitioning transmission owners raise serious statutory and constitutional concerns with respect to the effect of compulsory generator-funded upgrades on their business model. They ask why their current invéstors should be forced to accept risk-bearing additions to their network with zero return. We think ah even greater concern is whether any future providers of capital would choose to enter into that questionable bargain. See Hope, 320 U.S. at 603, 64 S.Ct. 281. At present, however, we have no need to reach the merits of those questions. Because the Commission failed even to respond to these concerns, and because it'offered neither evidence of nor motive for discrimination by non-vertically integrated transmission owners among their customers, it is sufficient now to require that it do so. On remand, FERC should provide reasoned consideration of these arguments by explaining whether, all risks are truly “baked in,” responding to the transmission owners’ “entire enterprise” argument, and addressing the effect of these orders on the ability of transmission businesses to attract future capital.

*583 III.
Setting aside the merits of the case, FERC contends in the alternative that our review is premature because the transmission owners can seek to adjust their rates in a future hearing under Section 205 of the Federal Power Act. We are thus urged not to intervene on the transmission owners’ behalf, because they can, and should, simply seek relief from FERC directly in a later hearing.
But for two reasons, a Section 205 hearing cannot provide the relief that the petitioning transmission .owners seek. First, FERC’s precedents do not provide compensation for several of the classes of risks that Petitioners allege will accompany construction and operation of the network upgrade facilities. For example, fines and penalties for violations of mandatory reliability standards and environmental regulations are generally charged directly to the utility, not passed through to customers via rate increases. See, e.g,, In re SCANA Corp., 118 FERC ¶ 61,028 at P 1, 7-8. Further, FERC has stated that it takes a comprehensive view of a company, its employees, and its operations when wielding its enforcement power against the utilities it governs. See generally Enforcement of Statutes, Orders, Rules, and Regulations, 113 FERC ¶ 61,068 (2005). As . such, compensation for the types of risks identified by the petitioning transmission owners may not be possible, even if proven in. a future hearing.
The second reason why a Section 205 hearing would be of little use to the petitioning transmission owners is that FERC has spoken with utter and consistent clarity as to the question of whether a rate of return is justified under the generator funding option. See Resp.Br. 33; August 2016 Rehearing Order PP 12-20; December 2015 Rehearing Order PP 56-59. If, in a future Section 205 hearing, the transmission owners were to seek to include generator-funded assets in their rate base,, a negative result is a foregone conclusion. The relevant question, then, is not whether the rate can be adjusted later in a Section 205 hearing—-but instead whether a transmission owner can be forced to accept generator-funded upgrades in the first instance. That .question is. squarely before us; we return it to FERC for a more thorough answer.
On a related point, the dissent suggests that since the Commission plans to take up the issue of generic interconnection costs in a pending rulemaking, it is unnecessary for us to consider Petitioners’ concern in this case. The dissent implies that FERC has consciously chosen a specific “manner of proceeding, addressing capital costs here' and generic interconnection cost issues in a separate docket,” Dissent at 589.
The Commission did not make this argument before us, and for good reason: the' purported plan to separate capital costs from other cost issues is fiction. (In fact, FERC’s sole mention of its separate rule-making in the proceedings below was to acknowledge and reject the Petitioners’ request to avoid adjudication while the rulemaking was in progress. See December 2015 Order PP 40, 60.) In the referenced rulemaking—Docket No. RM15-21— FERC requested comments on Intervenor AWEA’s proposals for changes to the’ standard interconnection agreements. See Notice of Petition for Rulemaking, Docket No. RM15-21 (FERC July. 7,. 2015). And those proposals explicitly include, in multiple locations, the precise issue of capital cost allocation.[16] This is unsurprising; as *584 explained at length above, the two issues are deeply intertwined.
Further, even assuming that FERC had intended such a “manner of proceeding” (and that such a dichotomy would be conceptually tenable), the dissent’s wait-and-see suggestion confuses adjudication— which is retroactive, determining whether a party violated legal policy—with rule-making, which is of only future effect. We once described an agency’s effort to offer future rulemaking as a response to a claim of agency illegality as an “administrative law shell game,” Am. Tel. & Tel. Co. v. FCC, 978 F.2d 727, 732 (D.C. Cir. 1992), a phrase the Supreme Court thought apt. See MCI Telecomm. v. Am. Tel. & Tel. Co., 512 U.S. 218, 222, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).
IV.
When we remand orders to FERC, two factors inform our decision whether to vacate: the gravity of the orders’ flaws, and the “disruptive consequences” that may result. Black Oak Energy, LLC v. FERC, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting Allied-Signal v. Nuclear Regulatory Comm’n, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).
As noted above, we have no need to finally decide the transmission owners’ central complaint in this case: that under the Federal Power Act and the Constitution, FERC cannot force them to construct and operate generator-funded network upgrades.[17] Indeed, we should not do so until the Commission has developed a record by considering that question itself. But we are troubled , by the prospect of allowing the orders to continue in the interim.
The transmission owners complain that generator-funded upgrades draft them into service to manage non-profit appendages to their network; we today remand in part because FERC failed to respond to that argument. By approving changes to the MISO tariff, however, the August 2016 Order on Compliance opens the floodgates to involuntary generator-funded interconnection projects.[18] And we must bear in mind that the Commission’s June 2015 Order indicates that its logic in this case would apply to all indirect upgrades as well. FERC may determine on remand that a transmission owner’s consent is required to impose generator-funded network upgrades, or that it would be unjust or unreasonable to force the transmission *585 owners to accept increased risk with no increased return. If it does not, Article III courts may subsequently require it to do so. In that event, what will happen to the projects that have commenced in the interim? How will the generators, who under the Commission’s logic will presumably have obtained funding from the capital markets, extricate themselves from those newly-invalid contracts? Will the financiers with whom they deal insert clauses imposing costly “break-up fees,” in anticipation of the ultimate resolution of this question? Or worse: will half-completed projects be left stranded because they were financially viable when generator-funded, but become unprofitable when they bear the full cost of the attendant risks under transmission owner funding?
We think it at least uncertain that FERC can reach the same result after addressing the deficiencies identified in this opinion; indeed, the potential-discrimination justification for FERC’s orders seems especially weak. But we think the prospect of disruptive consequences cuts decisively against the premature approval, and precipitate commencement, of construction projects under a tariff of questionable legality. Moreover, that FERC plans a rulemaking to consider interconnection problems and costs also suggests that it should approach those issues on a clean slate. We therefore vacate the orders—with the recognition that the Commission may, as always, file a petition for rehearing in the event it objects to such vacatur on ground we do not perceive— and remand for further proceedings consistent with this opinion.

So ordered.

. MISO operates in fifteen states located largely within the midwestem United States, along with the Canadian province of Manitoba.

. For a detailed description of the series of FERC orders that, led to the development of competitive power generation markets and the Creation of MISO, see Wisconsin Public Power, Inc. v. FERC, 493 F.3d 239, 246-50 (D.C. Cir. 2007); Midwest ISO Transmission Owners v. FERC, 373 F.3d 1361, 1363-65 (D.C. Cir. 2004).

. Standardization of Generator Interconnection Agreements and Procedures, Order No. 2003, FERC Stats. & Regs. ¶ 31,146 (2003), order on reh'g, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160, order on reh'g, Order No. 2003-B, FERC Stats. & Regs. 31,171 (2004), order on reh'g, Order No. 2003-C, FERC Stats. & Regs, ¶ 31,190 (2005), aff'd sub nom. Nat'l Ass’n of Regulatory Util. Comm’rs v. FERC, 475 F.3d 1277 (D.C. Cir. 2007).

. E.ON Climate & Renewables North America, LLC v. Midwest Indep. Transmission Sys. Op., Inc., 137 FERC ¶ 61,076 (Oct. 20, 2011).

. Under generator funding, the transmission owner does provide a refund of the reimbursable portion of construction costs—which amount to ten percent of capital costs for projects rated at 345 kilovolts or higher—in the form of a credit toward transmission services charged to the interconnecting generator. The' generator receives no reimbursement for the remaining ninety percent of these larger projects.

. This unexecuted FCA was submitted pursuant to Section 205 of the Federal Power Act, 16U.S.C. § 824d (2012).

. Midwest Indep. Sys. Operator, Inc., 141 FERC ¶ 61,220 (Jun. 18, 2015) (“June 2015 Order”).

. This language suggests that FERC thought transmission owner funding was unjust and unreasonable only because it was discriminatory. However, in the final orders the Commission seems to rest on two separate grounds: potential discrimination by transmission owners among generators, and excessive costs charged to generators with no increase in service, which FERC found to be unjust and unreasonable. See Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc., 153 FERC ¶ 61,352 at P 29, 32, 33 (Dec. 29, 2015) (“December 2015 Order”); Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc., 156 FERC ¶ 61,099 at P 15, 19 (Aug. 9, 2016) ("August 2016 Order Denying Rehearing”).

.In the third and fourth of the orders under review, FERC rejected another petition from six transmission owners (“August 2016 Order Denying Rehearing”) and accepted MISO’s compliance filing to remove a transmission owner’s ability to choose between funding options from the MISO Tariff ("August 2016 Order on Compliance”). In the fifth and final order on review in this case ("October 2016 Order”), the Commission denied a procedurally-oriented request for rehearing, with reference to its December 2015 Order and August 2016 Orders.

. The only- study alleging evidence of disparate costs charged generators was conceded by FERC to be flawed. See December-2015 Order at P 33.

. See, e.g., Calpine Corp. v. FERC, 702 F.3d 41, 43 (D.C. Cir. 2012) (“Order 888 was successful in causing major utilities nationwide to divest most of their generating facilities ....”). See also generally Wisconsin Public Power, Inc. v. FERC, 493 F.3d 239, 246-50 (D.C. Cir. 2007) (describing the series of Commission orders that led to the development of MISO and encouraged divestiture of generation assets).'

. As such, of the two alleged sources of increased costs under transmission owner funding—a missed opportunity to seek alternative, cheaper funding and a more onerous security requirement—the second seems to collapse into the first: any alternative financing package must account for the risk of loss, whether through an explicit security requirement (such as a letter of credit) or an implicit willingness to bear that risk expressed through a higher financing rate.

. This recovery is alleged to occur through a process by which transmission owners recoup their recognized expenses for such line items as operations and maintenance. See December 2015 Order at P 57 & n. 118.

. The dissent contends that Petitioners offered "only bare generalities about its uncompensated costs, but no specifics.” Dissent at 591. But risks—which are contingent possibilities of future adverse events—must be described in hypothetical terms. And Petitioners did offer specific examples to support the general argument that when they are denied the opportunity to fund construction that occurs within their grid, “the return earned is disproportionate to the size, complexity, and risks of the system the transmission owner owns and operates.” Request for Rehearing of the Indicated Transmission Owners, Docket Nos. EL15-68, EL15-36 (FERC January 28, 2016) at 14. Indeed, they cited FERC’s own summary of these risks, noting that FERC had addressed only one small subset (construction risks covered by financial security). Id. at 20-22. They offered compliance with Reliability Standards as just "one example of such risk” that had not been addressed. Id. at *581 22. And their subsequent discussion before us of uncompensated penalties stemming from electrocutions and blackouts caused by untrimmed trees demonstrates the eminent sensibility of recognizing “the fundamental reality that all new facilities bring incremental risk of operation.” Reply Br. 22; see id. at 17-24; Oral Arg. at 5:07-6:20.

. See, e.g., December 2015 Order at P 59 ("Our decision does not preclude the transmission owner from earning a return on these network upgrades from the interconnection customer where the transmission owner and the interconnection customer mutually agree ... any return that was available to a transmission owner when the initial funding election was made on a unilateral basis by the transmission owner is still available when the transmission owner’s initial funding option is made on a mutually agreed upon basis.”).

. See Petition for Rulemaking of the American Wind Energy Association to Revise Generator Interconnection Rules and Procedures, Docket No. RM15-21 (FERC June 19, 2015) *584 at 5 ("Reforms to improve certainty of network upgrade costs: ... ii. Allow a Transmission Provider to fund network upgrades (self-funding) only if agreed to by the Interconnection Customer.”); id. at 50-52 (recommending that "The GIPs Should Require the Interconnection Customer’s Agreement for the Interconnecting Transmission Owner to Self-Fund Network Upgrades,” id. at 50).

. Nor is it necessary to reach the petitioning transmission owners' argument that FERC departed from its precedent without justification, or that its orders here are illegal because they constitute a "novel” form of ratemaking under Hope. These issues may become appropriate for our consideration in the event that FERC adequately supports its decision.

. We think it noteworthy here that FERC, the petitioning transmission owners, and the intervening independent generators have all recognized that many interconnecting generators would prefer to use generator funding if permitted by FERC. And as one engineer noted before FERC, the backlog of new projects is high, causing a situation in which "Otter Tail and its neighboring transmission systems are rapidly confronting the need to fund and construct both direct and indirect Network Upgrades for new generation.” Affidavit of Dean Pawloski, Principal Engineer, Otter Tail Power Company at P 6 (January 12, 2015). The prospect, then, that today’s network upgrades will cumulatively constitute a significant fraction of tomorrow’s grid renders the petitioning transmission owners’ concern more credible.