# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 20, 2024     Decided May 27, 2025

No. 21-1256

CENTRAL HUDSON GAS & ELECTRIC CORPORATION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALLIANCE FOR CLEAN ENERGY - NEW YORK, ET AL.,
INTERVENORS

———

Consolidated with 21-1257

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Jason B. Tompkins* argued the cause for petitioners. With him on the joint briefs were *Paul A. Colbert*, *Andrew W. Tunnell*, *Lyle D. Larson*, *Abigail C. Fox*, and *Susan J. LoFrumento*.

*William M. Keyser* argued the cause for intervenors for petitioners. With him on the joint brief were *Steven M. Nadel*,

*Karen Bruni*, and *Gary E. Guy*. *Stacey Burbure* and *Johanna S. Dennehy* entered appearances.

*Jason T. Perkins*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Scott H. Strauss* argued the cause for intervenor for respondent New York Public Service Commission. With him on the brief were *Peter J. Hopkins*, *Lauren L. Springett*, and *John J. Sipos.*

*Gabriel L. Tabak* argued the cause for intervenors for respondent America Clean Power Association, et al. With him on the brief were *Bruce A. Grabow*, *Jennifer Brough*, and *David B. Johnson.*

Before: KATSAS, WALKER, and GARCIA, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: Petitioners are the owners of New York's electric-transmission grid. They want—but currently lack—the option to finance the upgrades that are sometimes required when new power sources connect to their grid. Investing in those upgrades would allow the transmission owners to raise the rates they charge and earn a return on those new investments. The owners sought to change the rules that prohibit owner upgrade funding, but the Federal Energy Regulatory Commission denied their requests. Because the Commission acted reasonably, we deny the owners' petitions for review.

3

**I**

The Federal Power Act "obligates FERC to oversee all prices" for the interstate transmission of electric energy and "all rules and practices affecting such prices." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016). Utilities must file "tariffs" with the Commission reflecting the rates they charge and the related rules. *Hecate Energy Greene Cnty. 3 LLC v. FERC*, 72 F.4th 1307, 1309–10 (D.C. Cir. 2023).

This case concerns the tariff that covers the New York state electricity grid. That grid is operated (but not owned) by the aptly named New York Independent System Operator (NYISO). *Id.* The relevant tariff, filed by NYISO, is known as the Open Access Transmission Tariff (OATT).

The OATT specifies the rates that transmission owners may charge. *See id.* It also addresses funding for grid upgrades. *Id.* at 1310–11. When new power sources come online, they must be connected to the grid. Often, the grid needs updates to accommodate the power influx generated by these new connections. *See Am. Clean Power Ass'n v. FERC*, 54 F.4th 722, 723–24 (D.C. Cir. 2022). The OATT allows the connecting energy generator to finance construction and installation of the upgrade. The generator "then convey[s] the [upgrade] to the relevant transmission owner[] to own, operate, and maintain." J.A. 793 ¶ 4. The transmission owners themselves, however, cannot fund the upgrade.

The six petitioners in this case—utility companies that each own a portion of the New York transmission grid—object to this arrangement. If the transmission owners could finance interconnection upgrades, then FERC's ratemaking rules would allow them to charge customers higher rates that permit a return on those new investments. But because the OATT prevents the owners from making the initial investment, the owners cannot raise their rates to reflect the return they might

have earned. *See* J.A. 793 ¶ 5. The owners contend that the current rules force them to bear uncompensated regulatory, cybersecurity, environmental, and operational risks associated with owning, operating, and maintaining the upgrades that others fund.

The Federal Power Act provides public utilities two means to revise FERC-approved rates and rules. First, Section 205 allows utilities to unilaterally file for changes to their rates. FERC must approve the proposed rates so long as they are "just and reasonable." 16 U.S.C. § 824d(a). Second, Section 206 allows any entity (not just a utility) to challenge existing rates by claiming they are "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a).

On April 9, 2021, the transmission owners filed two petitions with FERC. They invoked Sections 205 and 206 and requested that FERC amend the OATT to give them the option to fund interconnection upgrades and earn a return on those capital investments. On September 3, 2021, FERC rejected the Section 205 filing. FERC found that the owners' agreement with NYISO limited their Section 205 rights. In FERC's view, the agreement prevented the owners from filing for a rule change that would allow them to make new investments. FERC dismissed the Section 206 complaint on the same day. FERC concluded "that the [owners] failed to satisfy their burden" of "demonstrat[ing] that the existing [funding mechanism] is unjust, unreasonable, unduly discriminatory, or preferential." J.A. 677 ¶ 21.

The owners filed requests for rehearing on October 4, 2021. Because FERC did not respond to the rehearing requests within thirty days, they were deemed denied by operation of law on November 4, 2021. On March 24, 2022—after the owners had filed for review with this court—FERC issued a new order, which modified its original orders and responded to the issues raised in the owners' requests for rehearing. Per

*Evergy Kansas Central, Inc. v. FERC*, 77 F.4th 1050, 1055–56 (D.C. Cir. 2023), we have jurisdiction over both the original orders and the rehearing order, and we will consider arguments raised by FERC in both sets of orders.

**II**

FERC's orders are subject to "arbitrary and capricious" review. *Elec. Power Supply Ass'n*, 577 U.S. at 292 (quotation omitted). We ask if FERC "has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up).[1]

**A**

FERC properly dismissed the transmission owners' Section 205 filing.

Section 205 would ordinarily empower the owners to adjust the OATT's rules by filing directly with FERC. The owners, however, are members of NYISO and signed a contract that governs their relationship with NYISO. When the owners freely entered that contract, they also agreed to relinquish their baseline Section 205 filing rights. *See* NYISO-TO Agreement § 3.03. Under the agreement, the NYISO Board and Management Committee must first review and approve most Section 205–type filings seeking to change the NYISO tariff. *Id.* The owners retained only those Section 205 filing rights spelled out in a narrow set of exceptions. The sole

---

[1] With respect to our review of FERC's Section 205 orders, the parties filed letters under Federal Rule of Appellate Procedure 28(j) debating whether FERC's interpretation of the contract between the owners and NYISO ought to receive deference. We need not address that dispute, as we find that FERC's interpretation was correct irrespective of any additional deference that might be afforded to its interpretation of contracts.

exception that could justify the owners' filing here appears in Section 3.10(a) of the contract. That provision reserves an owner's right "unilaterally to file pursuant to Section 205 . . . to recover" (1) "all of [their] reasonably incurred costs, plus" (2) "a reasonable return on investment related to services under the [tariff]." *Id.* § 3.10(a).

The language of Section 3.10(a) mirrors the basic equation that FERC uses to set rates: FERC generally adds (1) "all expenses incurred," plus (2) "a reasonable return on capital invested." *Pub. Serv. Co. of N.M. v. FERC*, 653 F.2d 681, 683 (D.C. Cir. 1981); *see also Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1172 (D.C. Cir. 1987) (en banc). That mirroring makes sense, given the purpose Section 3.10(a) was evidently designed to serve: Within a contract that generally relinquished Section 205 rights, the transmission owners kept their ability to challenge basic inaccuracies in the calculation of their rate. Thus, if an owner believes its FERC-approved rate does not accurately capture its "incurred costs" or is not supplying an appropriate "return on investment," an owner need not secure the NYISO Board's and Management Committee's approval before pursuing relief.

The filing before us, however, did not seek to correct these two basic sorts of inaccuracies, and therefore does not fall within either of Section 3.10(a)'s prongs.

First, the owners' filing did not aim to recover "reasonably incurred costs." As FERC explained, the "costs" prong of Section 3.10(a) allows the owners only to "file to recover their incurred costs recoverable in transmission rates." J.A. 805–06 ¶ 28; *see also* J.A. 714 ¶ 22. The owners concede that they already recover all operating expenses associated with running the transmission upgrades, and they do not identify any expense they have actually incurred that is uncompensated. Instead, the owners argue that the rules governing upgrade funding should be changed to compensate them for "risks"

associated with owning and operating the upgrades. That framing illuminates the owners' true goal: They hope not to recoup costs already "incurred," but to anticipatorily recover *potential* costs that have not yet materialized.

As FERC explained, its approach to the "costs" prong of Section 3.10(a) "gives effect to" the "return on investment" prong. J.A. 805–06 ¶ 28. The "regulatory, reliability, cybersecurity, environmental, and operational risks that the [owners] state they face . . . are not costs under [the] provision," but instead are "the types of risks that . . . traditionally are" accounted for in calculating a utility's appropriate return on capital invested. J.A. 805 ¶ 27. In short, prospective risks are not "incurred costs" for purposes of either FERC's ratemaking calculations or Section 3.10(a).

On appeal, the owners attempt to rebrand their "risks" argument by suggesting that these risks increase their "cost of capital," and that the cost of capital should be treated as an "incurred cost" under Section 3.10(a). Petitioners' Brief 37. The owners, however, identify no authority referring to the cost of capital as an "incurred cost." Nor, likely, could they. The cost of capital is not an expense that the owners shoulder by virtue of operating the transmission grid. Instead, the "cost of capital" refers to the *rate of return* required to attract capital investments for a project. *See Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1208 (D.C. Cir. 1991) ("The cost of capital is the minimum rate of return necessary to attract capital to an investment." (quoting A. Lawrence Kolbe et al., *The Cost of Capital: Estimating the Rate of Return for Public Utilities* 13 (1984)). Thus, as FERC noted, appropriately compensating for the cost of capital is exactly what the "return on investment" calculation aims to do. Neither "risks," nor the "cost of capital" that reflects those risks, are relevant to identifying a utility's incurred costs. *See, e.g.*, *id.* ("[T]he Commission endeavors to set a utility's rate of return on equity at its cost of equity

capital."); *see also El Paso Nat. Gas Co.*, 145 FERC ¶ 61,040, at P 693 (2013); *United Airlines, Inc. v. FERC*, 827 F.3d 122, 130 (D.C. Cir. 2016).

That leaves the second prong of Section 3.10(a), which permits filings seeking to recover a "reasonable return on investment." As discussed, FERC acknowledges that "risks" are "traditionally" considered in its ratemaking process when calculating a utility's appropriate return on capital invested. Specifically, "risks" are considered when calculating "the appropriate base [return on equity]." J.A. 805 ¶ 27. As the Commission describes elsewhere in its rehearing order, the rate of return is set in part by looking at the risks owners face in operating their enterprise. J.A. 834–35 ¶ 67. The more risks a utility bears—including risks from system upgrades—the higher the rate of return. *See id.* Once the "appropriate" rate of return is set, it is multiplied by "the rate base," J.A. 805 ¶ 27, which represents the amount of "capital" that the utility has "invested," *Pub. Serv. Co. of N.M.*, 653 F.2d at 683.

FERC accepts that, under the second prong of Section 3.10(a), the owners could challenge a rate of return that inadequately compensated investments already made. *See* J.A. 836 ¶ 69. But the filing before us does not attempt either to change the rate of return applied to existing investments or to ensure that capital already invested is properly counted in the rate base. Instead, the owners filed to change the rules so that they could make new investments in interconnection upgrades and add those new capital investments to their rate base. As the owners' filing stated, they sought "to amend the [tariff's] Existing Funding Approach," so they could gain "the opportunity to fund the costs of [system upgrades] and thereby earn [the associated] return." J.A. 3. But as FERC points out, the owners retained only their "right to file" to recover an appropriate "return on investment," not a right to change the

rules of the road to allow them to make a new category of "future investment."  J.A. 806 ¶ 28 n.73.

In their opening brief, the owners' argument on this prong of Section 3.10(a) consists entirely of a conclusory statement that their filing should be construed "as an attempt to earn a 'reasonable return' (by being allowed to fund the investment in System Upgrades)."  Petitioners' Brief 37.  That statement is nonresponsive to FERC's conclusion—with which we agree— that Section 3.10(a) encompasses filings that seek to recover a reasonable return on *existing* investments and not the owners' very different request to change the rules to allow for *wholly new* investments.

In essence, the owners' filing attempts to enact a major policy shift—altering the rules relevant to every NYISO grid upgrade required by a new interconnection, with the intent of affecting region-wide rates and incentives.  A filing demanding such a substantial policy change is a poor fit for Section 3.10(a), which carved a narrow exception into a contract that otherwise requires the transmission owners to receive permission from NYISO before seeking alterations to the OATT.  Under the terms of the owners' agreement with NYISO, NYISO itself must first endorse the owners' proposal to fundamentally revise the tariff.  *See* J.A. 806 ¶ 29.

The owners' remaining arguments are unavailing.  The owners argue that FERC ignored relevant evidence verifying that current rates do not properly compensate them for risks they face.  *See* Petitioners' Brief 40.  But absent a showing that the risks are "incurred costs" or otherwise within the terms of Section 3.10(a), that sort of evidence is irrelevant to the question whether this Section 205 filing was procedurally proper.  The owners further argue that FERC, through its reading of Section 3.10(a), has effectively prohibited them from filing under Section 205, which FERC cannot lawfully do.  *See* Petitioners' Brief 38–39.  Here, however, it was the

owners who chose to cede their rights by contract, as our precedent permits. *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 10–11 (D.C. Cir. 2002); *Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 283 (D.C. Cir. 2006). In evaluating the NYISO-TO Agreement, FERC did not "abrogat[e] or modif[y]" an "existing contract rate" to artificially limit the owners' rights. *Wisc. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 271 (D.C. Cir. 2007). Instead, FERC simply interpreted the contract, and it did so appropriately.

Finally, the owners argue that FERC's conclusion here is inconsistent with its finding in a later-issued order, *PPL Elec. Utils. Corp.*, 177 FERC ¶ 61,123 (2021), which held that other transmission owners, governed by a different contract, had not waived their Section 205 rights and so could submit a similar filing. But the rights-reservation provision at issue in *PPL* was materially different from the one here. That provision allowed transmission owners to file to "establish" a "transmission revenue requirement for services provided . . . with respect to [their] Transmission Facilities." *Id.* at P 34. FERC found that, because the contract defined network upgrades as "transmission facilities," the contract permitted requests for rule changes to "establish" a new source of revenue stemming from network upgrades. *Id.* at P 35. That FERC reached a different conclusion under that differently worded provision does not suggest any arbitrary decision making.

**B**

The transmission owners are no more successful in challenging FERC's dismissal of their Section 206 complaint.

Section 206 of the Federal Power Act permits an entity to request a rate alteration because the existing rate is "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). In evaluating the "unjust[ness]" of the challenged rate, we focus on the "total effect" of the rate

selected, not on isolated "infirmities." *See Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 602 (1944). We presume the existing rate is valid and place a "heavy burden" on the challenger to demonstrate it is not. *Id.*; *see also* 16 U.S.C. § 824e(b). Here, FERC reasonably determined that the owners failed to meet that burden.

The owners argue that it is "unjust" and "unreasonable" to prevent them from funding grid upgrades. The owners claim that, as a result, they must bear uncompensated risks associated with owning the upgrades. *See* Petitioners' Brief 17–18. They claim they may face difficulty attracting capital because they cannot earn returns on this growing portion of their assets. *Id.* at 43–45. And they claim that the current rate is "discriminatory" because transmission owners in other regions can fund system upgrades, and so are more attractive to investors. *Id.* at 46–47.

The Commission fully and reasonably addressed these arguments. The Commission acknowledged that some risks accompany ownership and operation of the upgrades. But it concluded that the owners mustered no evidence showing those risks go uncompensated. *See* J.A. 694 ¶ 58; J.A. 831–32 ¶¶ 63–65. FERC consistently explained that its ratemaking approach includes an "enterprise-wide" risk calculation that compensates the owners for any such risks they face. J.A. 696 ¶ 60; J.A. 821–22 ¶ 49; J.A. 834–36 ¶¶ 67–69; *see also Hope*, 320 U.S. at 603 (mandating that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks").

The types of risks the owners described are not unique; these are "general risks faced by utilities" in operating their grids. J.A. 831 ¶ 63. The Commission already calculates each utility's return on equity "based on the risk profile of the enterprise as a whole," and that return is "subject to potential adjustment if those enterprise-wide risks change." J.A. 834–

35 ¶ 67. The owners cited purportedly contrary expert testimony, but that expert "provide[d] evidence" only that enterprise-wide risks existed, "not that the current rates charged . . . are not sufficient." J.A. 831 ¶ 63. FERC therefore concluded that the owners "failed to demonstrate that their currently approved rates of return, calculated for each enterprise as a whole, do not consider enterprise-wide risks of investing in the entire transmission system, including owning, operating, and maintaining System Upgrades funded by interconnection customers." J.A. 835 ¶ 68; *see also* J.A. 837–38 ¶ 71 (similar).

Similarly, FERC adequately explained that the owners offered no proof of difficulty or disadvantage they faced in attracting capital. J.A. 831–32 ¶¶ 63–65; J.A. 695–97 ¶ 60. For example, they provided no "economic evidence of a systemic problem," such as a "report[] to investors" on the additional risks they faced or "evidence that rating agencies have assigned transmission owners to higher risk categories based on concerns about the amount of System Upgrades on the transmission system." J.A. 831–32 ¶¶ 63–64; J.A. 697 ¶ 61. The owners instead relied on "speculati[on]" that these impacts could occur, which the Commission deemed "insufficient to satisfy" their Section 206 burden. J.A. 832 ¶ 64.

FERC also reasonably rejected the owners' argument that the funding rules are "discriminatory" under Section 206. Although other regional operators' tariffs permit grid owners to fund upgrades, FERC explained that it has long allowed different regional transmission organizations to follow different rules, in recognition of regional variations including potential differences in "geographic size and location." J.A. 833 ¶ 66. FERC's orders conclude that the mere "existence" of a rate in one region "does not on its face make it unduly discriminatory for that same rate to not be available in another . . . region." *Id.* Additional evidence would be required to

show discrimination. And because, as FERC's orders illustrated, the owners offered no further support for their claims—and on review identify no relevant evidence overlooked by FERC—they also failed to carry their burden on this point. *See id.*

On review, the owners argue in two ways that they did not need to tangibly demonstrate the claimed unjustness and discrimination.[2] First, they rely on cases explaining that FERC is not always required to provide "empirical evidence" to support the policy choices it makes in Section 206 proceedings. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 64–68 (D.C. Cir. 2014). But nothing in those cases, nor any others we can identify, suggests that it is arbitrary or capricious for the agency to ask a party filing a Section 206 complaint to produce actual evidence supporting its claims that an existing rate is unjust or unreasonable. Instead, we have previously affirmed the Commission's orders denying Section 206 petitions where the complaining party "failed to support it[s arguments] with sufficient real-world evidence," *La. Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 695 (D.C. Cir. 2017), or did not "offer any evidence (beyond speculation)" to demonstrate the harms it asserted, *Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 409 (D.C. Cir. 2000). In these proceedings, the transmission

---

[2] The owners also cursorily argue that FERC overlooked evidence in the record supporting their view. They contend that FERC ignored evidence and point to expert testimony claiming—without support—that FERC's enterprise-wide risk calculation accounts only for risks faced by those pieces of the enterprise included in the rate base. *See* Petitioners' Brief 19 & n.42; J.A. 649–52. But FERC's order answered those claims. It described that "the Commission calculates a utility's [return on equity] based on the risk profile of the enterprise as a whole." J.A. 834 ¶ 67. And it dismissed the testimony as failing to offer evidence demonstrating that the enterprise-wide risk calculation did not compensate for the described risks. *See* J.A. 831 ¶ 63.

owners did not show it was unreasonable for the Commission to require that the owners support their claims with evidence. *See also Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13 (D.C. Cir. 2021) ("The proponent of the rate change bears the burden of proof . . . . Section 206 therefore mandates a two-step procedure whereby the Commission must make an explicit finding that the existing rate is unlawful before setting a new rate . . . . [W]ithout a showing that the existing rate is unlawful, the Commission has no authority to impose a new rate." (internal quotations omitted)).

Second, the owners rely heavily on this court's decision in *Ameren Services Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018). That litigation also revolved around the choice between generator or owner funding of interconnection upgrades. *See id.* at 573; 579–81. Those FERC orders twice reached our court—once in *Ameren* and again in a follow-on case. But in both cases we did not address the merits of the upgrade-funding dispute; we merely remanded for FERC to adequately address objections in the record. *See id.* at 582; *Am. Clean Power Plan Ass'n*, 54 F.4th at 723.

The owners overread *Ameren*, asserting that it "rejected" the "argument that risks/costs associated with System Upgrades are somehow already incorporated in" transmission owners' returns. Petitioners' Brief 51. But *Ameren* held only that FERC could not assume that conclusion without explanation. *See* 880 F.3d at 580. *Ameren* did not require any particular outcome, nor does it relieve the New York transmission owners of their burden to produce relevant evidence in this proceeding. Here, unlike in the *Ameren* orders, FERC addressed the transmission owners' argument that they are forced to bear uncompensated risks, explained that those risks were in fact compensated through FERC's existing approach, and concluded the owners did not offer evidence to

sustain their contrary assertions. *See* J.A. 819–20 ¶ 46 (distinguishing *Ameren* on this basis).

FERC properly concluded that these owners, on this record, did not carry their burden under Section 206. The validity of the Commission's orders necessarily turns on the specific evidence (or lack thereof) presented in these proceedings. Nothing in FERC's orders appears to foreclose a different outcome on a different record, nor does this opinion foreclose that possibility.[3]

## C

Finally, the transmission owners have not shown that FERC's order accomplished an unconstitutional taking. Though a rate may enact a taking where it is sufficiently unjust and therefore confiscatory, *see Hope*, 320 U.S. at 601; *Jersey Cent. Power*, 810 F.2d at 1175, as we have explained, the owners could not make a threshold showing of unjustness.

## III

The petitions for review are denied.

*So ordered.*

---

[3] The owners also suggest that FERC failed to discuss and distinguish *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), and *Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679 (1923). But FERC thoroughly discussed and persuasively distinguished these cases, too, explaining that they related to instances where an entity had already made an *upfront* capital investment and was denied the opportunity to earn a return on that investment.